IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MĀLAMA MĀKUA, a Hawai`i non-profit corporation, | CIVIL NO. 00-00813 SOM/LEK |
| Plaintiff, | ORDER DENYING DEFENDANTS' MOTION TO MODIFY SETTLEMENT AGREEMENT AND STIPULATED ORDER |
| vs. | |
| DONALD H. RUMSFELD, Secretary of Defense; and FRANCIS J. HARVEY, Secretary of the United States Department of the Army, | |
| Defendants. | |

ORDER DENYING DEFENDANTS' MOTION TO MODIFY
SETTLEMENT AGREEMENT AND STIPULATED ORDER

I.    INTRODUCTION.

Defendants Donald H. Rumsfeld and Francis J. Harvey (collectively, "the Army")[1] seek leave of court to resume live fire training at Makua Military Reservation on Oahu for soldiers scheduled to be sent to Iraq.  This court recognizes how weighty any decision affecting training is, and how real the dangers to the soldiers in combat are.  But the parties and this court must operate in accordance with applicable law, and the Army may not escape that law in the face of that danger.  Having failed to

_____

[1] Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Francis J. Harvey, the current Secretary of the United States Department of the Army, is substituted for Louis Caldera, who was originally named in the case as the Secretary of the Army.

satisfy the law, the Army may not resume live fire training at Makua.

Live fire training is prohibited by the Settlement Agreement and Stipulated Order ("Stipulated Order") filed on October 4, 2001.  The Army contends that changed circumstances warrant a lifting of that prohibition.  This court disagrees.

First, the Stipulated Order provides for modification based on changed circumstances only during the first three years following entry of the Stipulated Order.  The Army agreed that, if it failed to complete an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA") within three years, it would cease live fire training. The Army comes before this court more than four years since the Stipulated Order was entered, without having completed the EIS.

Even if the court could consider changed circumstances and could lift the ban on live fire training, that would be warranted only if those circumstances were not anticipated by the parties at the time they signed the Stipulated Order.  The history of this case makes it clear that the circumstances that the Army now relies on were anticipated.  The Stipulated Order was entered into after the attacks of September 11, 2001, and in contemplation of war, the main circumstance the Army identifies as a change.

Finally, even if the purported changed circumstances could be considered, the balance of harms, on the record presently before this court, weighs against permitting resumption of live fire training.  Adequate training is undeniably critical. Without it, soldiers surely face increased risk of injury and death.  But the Army does not establish for this court that training will only be adequate if live fire training occurs *at Makua*.  Makua is the habitat of numerous endangered species. Associated with Native Hawaiian deities, Makua Valley is sacred land to Native Hawaiians.  The record shows that there are other training venues, that many of the soldiers are scheduled to be trained elsewhere, and that the need for further training at Makua can only be determined after that other training has occurred.  If training *at Makua* is essential, it is the Army's burden on this motion to show that.  The Army does not do that.

II.      <u>BACKGROUND FACTS.</u>

This case began more than five years ago.  Throughout this litigation, Malama Makua's goal has been to have the Army prepare an EIS for proposed training at Makua.  The issues originally raised in this lawsuit were discussed in this court's earlier orders.  <u>See</u>, <u>e.g.</u>, <u>Malama Makua v. Rumsfeld</u>, 163 F. Supp. 2d 1202 (D. Haw. 2001).  On July 16, 2001, this court preliminarily enjoined the Army from conducting live fire

3

military training at Makua pending the court's determination of
whether the Army had to prepare an EIS.

The parties adjusted their approaches in this case
when, two months later, the United States was attacked.  Less
than a month after September 11, 2001, the parties entered into a
settlement agreement, which the court adopted in the form of the
Stipulated Order.  Malama Makua agreed that the Army could
conduct limited training exercises for three years.  The Army was
specifically permitted to conduct sixteen Company Combined Arms
Live Fire Exercises ("CALFEX") at Makua during the first year
following entry of the Order, nine company live fire exercises
during the second year, and twelve during the third year.  The
Stipulated Order required training to stop if archaeological or
cultural sites were damaged by training exercises.  The exercises
also had to stop if training-related fires surrounded the Company
Combined-Arms Assault Course.  If a training-related fire started
outside the south firebreak road, the Army had to consult with
the United States Fish and Wildlife Service before resuming any
training.

The Army, for its part, agreed to "commence preparation
and diligently pursue completion of an EIS" and to "complete the
EIS as soon as possible."  Paragraph 4(b) of the Stipulated Order
said, "In the event defendants fail to complete the EIS and
publish in the Federal Register a [Record of Decision ("ROD")]

4

within three years from the date this Court approves this
Agreement, no live fire training shall be conducted at MMR until
defendants complete the EIS and publish a ROD."

Paragraph 4(c) provided the mechanism for seeking
modification of the Stipulated Order's limitations on training:

> The Parties reserve the right to seek to
> modify the limitations on training set forth
> in this Agreement due to changed
> circumstances.  In the event that the Parties
> do not reach agreement on a proposed
> modification, either Party may bring a motion
> to modify the training limitations.  Any such
> motion brought by defendants will be subject
> to the standards for injunctive relief in
> cases where a NEPA violation has been found.

The court approved the Stipulated Order on October 4,
2001.  Now, 52 months later, the Army has still not completed the
EIS.  Pursuant to paragraph 4(b) of the Stipulated Order, the
Army has been prohibited from conducting any live fire training
at Makua since early October 2004.

The Army now seeks to resume live fire training at
Makua to prepare the 25th Infantry Division (Light) for
deployment to Iraq in August 2006.  The Army represented at the
hearing on the present motion that it would complete the EIS in
March or April of this year, but that it needed the ban on live
fire training lifted before completing the EIS because of the
considerable time involved in preparing for deployment.

III.      <u>ANALYSIS.</u>

As discussed in greater detail below, the court concludes that the Stipulated Order does not contemplate any resumption of live fire training at Makua if an EIS has not been completed by October 2004.  The court also engages in a series of "even if" analyses below, concluding at every turn that the Army's request must be denied.

A.   Paragraph 4(c) of the Stipulated Order Does Not <u>Apply to the Army's Request.</u>

Paragraph 4(c) of the Stipulated Order states that the parties may "seek to modify the limitations on training set forth in this Agreement due to changed circumstances."  It is this provision that, according to the Army, permits it to seek resumption of live fire training.  But the provision is inapplicable.  Paragraph 4(c) relates to modifications of training limitations, not to a lifting of the total ban on live fire training.

In interpreting the provisions of the Stipulated Order, this court treats the Stipulated Order as a consent decree.  The Stipulated Order was agreed to by the parties and entered as this court's order, dissolving this court's earlier preliminary injunction.  Thus, the Stipulated Order has a "dual character," partaking of "both a contract of settlement and a final judgment."  <u>Gilmore v. People of the State of Cal.</u>, 220 F.3d 987, 1000, 1001 n.17 (9th Cir. 2000) (discussing consent decrees and

quoting <u>Local Number 93, Int'l Ass'n of Firefighters v. Cleveland</u>, 478 U.S. 501, 519 (1986)).

It is the contract nature of the Stipulated Order that governs this court's interpretation of its provisions.  <u>See United States v. Asarco, Inc.</u>, 430 F.3d 972, 981 (9th Cir. 2005) ("This Court has applied contract principles in accordance with Supreme Court precedent when interpreting consent decrees." (citing <u>Molski v. Gleich</u>, 318 F.3d 937, 956 (9th Cir. 2003)). The construction of contracts is governed by principles of local law.  <u>United Commercial Ins. Serv., Inc. v. Paymaster Corp.</u>, 962 F.2d 853, 856 (9th Cir. 1992) (citation omitted); <u>see also Boskoff v. Yaho</u>, 217 F. Supp. 2d 1077, 1085 (D. Haw. 2001).

Hawaii law provides that courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous.  <u>State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.</u>, 90 Haw. 315, 324, 978 P.2d 753, 762 (1999) (citing <u>Hanagami v. China Airlines, Ltd.</u>, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984)).  "[C]ontractual terms should be interpreted according to their plain, ordinary meaning and accepted use in common speech."  <u>Id.</u> (citing <u>Amfac, Inc. v. Waikiki Beachcomber Inv. Corp.</u>, 74 Haw. 85, 108, 839 P.2d 10, 24 (1992)).  "The court should look no further than the four corners of the document to determine whether an ambiguity exists," <u>id.</u> (citation omitted), as whether a contract is ambiguous is a

question of law.  Found. Int'l, Inc. v. E.T. Ige Const., Inc.,

102 Haw. 487, 496, 78 P.3d 23, 32 (2003) (citation omitted).

It is only if a consent decree is ambiguous that a

court may look to extrinsic evidence to interpret its terms.

State Farm Fire & Cas. Co., 90 Haw. at 324, 978 P.2d at 762

(noting that the parol evidence rule, which "bars evidence of

collateral agreements that would vary or alter the written terms

and is called into play where the issue involves the rights and

duties created by the instrument," does not apply when an

ambiguity exists); see also Asarco, 430 F.3d at 980.

Paragraph 4(c) of the Stipulated Order is best

understood when seen in the context of the other subparts of

paragraph 4:

> a.  Defendants will complete the EIS as
> soon as possible. . . .
>
> b.  In the event defendants fail to
> complete the EIS and publish in the Federal
> Register a ROD within three years from the
> date this Court approves this Agreement, no
> live fire training shall be conducted at MMR
> until defendants complete the EIS and publish
> a ROD.
>
> c.  The Parties reserve the right to
> seek to modify the limitations on training
> set forth in this Agreement due to changed
> circumstances. . . .

By the plain and ordinary meaning of the terms in

paragraph 4(c), either party may seek to modify only the

"limitations on training."  Under paragraph 4(b), training is

allowed during the first three years following entry of the
Stipulated Order.  Numerous specific limitations on such training
are set forth in paragraphs 2 and 3.  Paragraph 3 applies by its
terms to company live fire exercises "authorized pursuant to
paragraph 2."  Paragraph 2, in turn, speaks of company live fire
exercises allowed at Makua during "the first twelve (12) months
immediately following this Court's approval of this Agreement,"
then during "the second year (the following twelve (12) months),"
and finally "in the third year (again, the following twelve (12)
months)."  In allowing a party "to seek to modify the limitations
on training set forth in this Agreement," paragraph 4(c) clearly
and unambiguously refers to the limitations in paragraphs 2
and 3, which apply only to training in the three years
immediately following entry of the Stipulated Order on October 4,
2001.  Thus, paragraph 4(c) does not apply to the total ban on
live fire training set forth in paragraph 4(b) and does not
contemplate the present request by the Army.[2]

Even if paragraph 4(c) could be said to be ambiguous as
to whether it permits a lifting of the total ban on live fire
training, the Army's motion would fail.  Malama Makua's position

---

[2] Paragraph 15(b) of the Stipulated Agreement also provides
for modification by the court upon motion of either party, but
the Army does not rely on that provision.  In any event,
paragraph 15(b) only sets forth the procedure for bringing a
motion before the court and provides neither a substantive right
to seek modification nor any standard for the court to apply.

is that, because there has been no live fire training at Makua since October 2004, given the Army's failure to complete an EIS, there are no "limitations on training" to be modified. Extrinsic evidence establishes that Malama Makua is correct in arguing that the parties did not intend paragraph 4(c) to apply once the total ban took effect.

At the hearing on this motion, Malama Makua presented the court with Exhibit 51, an email message from Stephen Bartell of the Department of Justice to David Henkin, counsel for Malama Makua. The subject line of the email reads: "Makua: Here are our final drafts – settlement agreement and stipulation." Attached to the email is a "Settlement Agreement Draft," which is a precursor to the Stipulated Order. In the Settlement Agreement Draft, the Army proposed the following:

> 4. The Army will endeavor to complete the EIS as soon as possible. Pending completion of the EIS, the Army may continue to train in accordance with this agreement, provided that (1) in the event the Army fails to complete the EIS and reach a decision within three years from the date this Court approves this Agreement; or (2) in the event that the Army, due to changed circumstances, seeks to modify this Agreement without plaintiff's consent, then plaintiff's [sic] may reinitiate litigation challenging the defendants' compliance with NEPA.

This proposed paragraph 4 was ultimately transformed into paragraphs 4(a–c) of the Stipulated Order. Compare Ex. 51 ¶ 4 with Ex. A ¶ 4. Two features of the earlier proposal are

notable here.

First, the earlier proposal provides that the Army could seek to modify "this Agreement" in general.  The Stipulated Order, by contrast, reserves the right to modify only "the limitations on training set forth in this Agreement."  This alteration indicates that the "limitations on training" in paragraph 4(c) referred to something less than the entire agreement.  This evidence lends support to Malama Makua's position that, once the ban on training took effect in October 2004, the Army was no longer training and, thus, could no longer seek modification of "limitations on training."

Second, the earlier proposal suggests that any modification of "this Agreement" would be unconnected to the Army's failure to complete the EIS in three years.  The earlier proposal says that the Army could continue to train, but that Malama Makua could revive its lawsuit if either (1) the Army failed to complete the EIS in three years, "or" (2) the Army, "due to changed circumstances," sought to modify "this Agreement" without Malama Makua's consent.  The use of the word "or" suggests that the Army was proposing that its failure to complete the EIS in three years would be something separate and distinct from any request to modify based on changed circumstances.  This is consistent with what the parties ultimately agreed to, placing the requirement that the EIS be completed in three years in

11

paragraph 4(b) of the Stipulated Order, as a provision separate from the modification provision in paragraph 4(c).

Whether consideration of paragraph 4(c) is limited to the four corners of the Stipulated Order or informed by reference to extrinsic evidence, that provision authorizes modification of only the limitations on training that were in effect until October 2004.  The Army's reliance on paragraph 4(c) in seeking to lift the ban on training is misplaced.  On this basis alone, the Army's motion, premised entirely on paragraph 4(c), fails.

> B.   Even if Paragraph 4(c) Applies to Modifications Sought After October 2004, the Army Fails to Establish That Unanticipated Changes Warrant Modification.

Even if paragraph 4(c) did authorize the Army's request to lift the ban on live fire training, paragraph 4(c) would permit only modifications "due to changed circumstances."  Ex. A ¶ 4(c).  In the absence of "changed circumstances," the Stipulated Order may not be modified pursuant to paragraph 4(c).

The Army contends that "four circumstances have changed significantly since October 2001":

> First, the considerable data and experience the Army has gained from the live fire exercises conducted under the settlement agreement show that the exercises do not have a substantial impact on the environment, and that the Army's careful efforts to minimize that impact have succeeded.  Second, starting in March 2003 and continuing through today, the nation has had over a hundred thousand soldiers fighting a land war in Iraq in which every soldier is a target.  Third,

12

> substantial elements of the 25th Infantry
> Division will soon be fighting in that war.
> Fourth, despite the Army's diligent efforts,
> and due to circumstances beyond the Army's
> control, the EIS has taken longer to complete
> than was foreseen in October 2001.

Motion at 2.

Any determination of whether the above matters constitute "changed circumstances" must begin with a definition of "changed circumstances." The court is aided in defining this contractual term by the law that has developed in the context of Rule 60(b)(5) of the Federal Rules of Civil Procedure.

Rule 60(b)(5) provides for modification of an order when "it is no longer equitable that the judgment should have prospective application." When a party seeks to modify a consent decree under Rule 60(b)(5), "a court must first interpret the terms and provisions of the decree as it would a contract to determine if the moving party anticipated a significant change in factual conditions, thereby making modification improper." Asarco, 430 F.3d at 976. "The moving party must satisfy the initial burden of showing a significant change either in factual conditions or in the law warranting modification of the decree." Id. at 979 (citing Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992)). "The district court must then determine whether the proposed modification is suitably tailored to resolve the problems created by the changed factual or legal conditions." Id. (citing Rufo, 502 U.S. at 391).

13

In particular, if the movant cites significantly changed factual conditions, "it must additionally show that the changed conditions make compliance with the consent decree 'more onerous,' 'unworkable,' or 'detrimental to the public interest.'" Id. (citation omitted). "A court should not ordinarily modify a decree, however, 'where a party relies upon events that actually were anticipated at the time it entered into a decree.'" Id. (citing Rufo, 502 U.S. at 385). If the party anticipated such events, it can obtain modification only if it satisfies the "heavy burden" of convincing the court "that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Rufo, 502 U.S. at 385.

The Army argues that the court should not apply the Rule 60(b)(5) analysis in defining "changed circumstances," as that term is used in paragraph 4(c) of the Stipulated Order. The Army notes that, although the parties reserved the right to bring motions under Rule 60, paragraph 4(c) contemplates that a request for modification will be "subject to the standards for injunctive relief in cases where a NEPA violation has been found." The problem with the Army's argument is that it skips a step. Assuming paragraph 4(c) applies to modification requests once the total ban on live fire training is in effect, paragraph 4(c) requires that any modification request be based on "changed

14

circumstances."  It is only if "changed circumstances" actually exist that the court applies the standards for injunctive relief applicable when a NEPA violation has been found.  Thus, the Army's reference to the NEPA standard puts the cart before the horse.  Nothing in paragraph 4(c) precludes the court's reliance on Rule 60(b)(5)'s analogous examination of changed circumstances.

Critical to this court's definition of "changed circumstances" is the concept of some limitation on what qualifies as a "changed circumstance."  Without such a limitation, almost anything could justify a modification of the Stipulated Order.  The requirement that a circumstance be unanticipated reasonably limits the justifications for modification.

None of the four circumstances identified by the Army qualifies as a "changed circumstance."

> 1.   The Army's Experience with Live Fire Training at Makua After October 2004 Is Not A Changed Circumstance.

The Army alleges that its experience with live fire training at Makua after the Stipulated Order was entered constitutes a changed circumstance.  According to the Army, "the live fire exercises conducted under the [Stipulated Order] show that the exercises do not have a substantial impact on the

environment, and that the Army's careful efforts to minimize that impact have succeeded."  Motion at 2.

Even assuming that the Army's efforts to protect the environment and cultural resources were successful during the three years following entry of the Stipulated Order, the court is taken aback by the Army's argument that this is a change.  Surely the Army was anticipating that it would protect those resources. This cannot be an unanticipated change unless the Army was expecting failure even as it entered into the Stipulated Order.

Given what must have been its expectation that it would indeed succeed, the Army cannot show a changed circumstance unless it "additionally show[s] that the changed conditions make compliance with the consent decree 'more onerous,' 'unworkable,' or 'detrimental to the public interest.'"  <u>Asarco</u>, 430 F.3d at 979 (citing <u>Small v. Hunt</u>, 98 F.3d 789, 795 (4th Cir. 1996)). The Army does not (and cannot in good faith) argue that its alleged success in protecting the environment makes compliance with the Stipulated Order more onerous or unworkable, or detrimental to the public interest.  The Army's belief that future training will not harm the environment is therefore not a significantly changed factual condition.  <u>See</u> <u>id.</u>

        2.    The War in Iraq Is Not An Unanticipated <u>Changed Circumstance.</u>

The Army asserts that the war in Iraq was unanticipated and constitutes a significantly changed factual condition that

16

justifies a lifting of the ban on live fire training.  Motion
at 2.  This ignores the parties' very purpose in reaching an
agreement shortly after September 11, 2001.  The parties entered
into the Stipulated Order precisely because they were
anticipating armed conflict.

   Granted, the Stipulated Order does not mention Iraq,
and the parties may or may not have anticipated at the time they
entered into the Stipulated Order that soldiers would be sent to
Iraq.  The precise location of the conflict, however, is not
material to whether live fire training should occur at Makua.  If
soldiers need live fire training at Makua, they presumably need
that training regardless of whether they are sent to Afghanistan,
Iraq, or some other location for which the Army concludes Makua
provides an analogous training environment.  What is material is
the parties' anticipation that war would occur somewhere and that
units would need to be trained for deployment.

   Having concluded that the Army anticipated armed
conflict, the court turns to the question of whether the Army
establishes that the war in Iraq makes compliance with the
consent decree "more onerous, unworkable, or detrimental to the
public interest."  See Asarco, 430 F.3d at 979.  The Army does
not satisfy its burden of making such a showing.  The war in Iraq
does not hinder the Army's ability to comply with the Stipulated
Order.  The Army is still able to pursue completion of the EIS

and abide by the prohibition on live fire training at Makua.
Thus, the Army does not show that the war in Iraq constitutes an
unanticipated and changed circumstance warranting any
modification at all.

>     3.    The Upcoming Deployment of the 25th Infantry
>           Division Is Not A Changed Circumstance.

The Army contends that the upcoming deployment of the
25th Infantry Division to Iraq was unanticipated and constitutes
a changed circumstance justifying resumed live fire training at
Makua.  By signing the Stipulated Order, the Army agreed to cease
live fire training if it did not complete the EIS by October 4,
2004.  With a stated mission "to deploy to protect the interests
of the United States," Ex. 1 at 3, the Army must have anticipated
that cessation of live fire training at Makua after October 4,
2004, might affect its mission to prepare troops stationed in
Hawaii for deployment.  Indeed, in opposing Malama Makua's motion
for preliminary injunction before September 11, 2001, the Army
argued with the same urgency that its "mission to deploy [and] to
protect the interests of the United States" would be "severely
harmed" if its ability to train at Makua continued over a long
period of time.  Ex. 1 at 3.  The Army also contended then that,
"if soldiers in the 25th Infantry Division do not receive the
mandatory training, the risk of mission failures and casualties
for the unit is substantially increased."  Ex. 1 at 3.  If the

Army knew this before September 11, 2001, it must have known this when it entered into the Stipulated Order.  Thus, even assuming the Army's assessment of severe harm is correct, it was an anticipated harm.

Because the Army anticipated that the 25th Infantry Division would be unable to train at Makua in anticipation of deployment, the Army bears the burden of showing that the upcoming deployment makes compliance with the consent decree "more onerous, unworkable, or detrimental to the public interest."  Asarco, 430 F.3d at 979.  The record before this court includes evidence that company live fire exercises can occur at alternate training locations, such as the National Training Center ("NTC") in California and the Pohakuloa Training Area ("PTA").  Indeed, Army officials indicate that they expect to train many of the 25th Infantry Division soldiers at NTC, and that only after assessing the results of training at NTC can the Army decide if live fire training at Makua is necessary for those troops.  See Deposition of John Michael Bednarek (12/21/2005) ("Bednarek Depo.") at 53-55, 71, 73, 127, 130, 133, 135, 151-53; Deposition of Walter E. Piatt (12/20/2005) ("Piatt Depo.") at 107.  The Army does not show that the ban on live fire training at Makua makes the Army's compliance with the Stipulated Order more onerous or unworkable.  Nor does the Army show that the public's interest in the human environment is compromised by

19

the 25th Infantry Division's upcoming deployment, or that the public's interest in national security is harmed by the ban on live fire training.  This purported "changed circumstance" does not justify modification of the Stipulated Order.

> 4.    The Parties Contemplated that the EIS Might Take Longer Than Three Years to Complete.

The Army alleges that, "despite the Army's diligent efforts, and due to circumstances beyond the Army's control, the EIS has taken longer to complete than was foreseen in October 2001." Motion at 2.  The Army says that this is a changed circumstance that justifies modification of the Stipulated Order. But the Army consented to paragraph 4(b), which prohibits live fire training at Makua unless the Army completes the EIS and publishes a ROD within three years of entry of the Stipulated Order on October 4, 2001.  In agreeing that it would cease live fire training at Makua if it did not complete the EIS within three years, the Army clearly anticipated that the EIS might take longer than three years.  Regardless of whether the delay in completing the EIS was "beyond the Army's control," the Army addressed the possibility that the EIS might take longer than three years to complete.

Because the Army anticipated that the EIS might take longer than three years, that circumstance is not a "changed circumstance" unless the Army establishes that the delay makes

compliance with the consent decree "more onerous, unworkable, or detrimental to the public interest." Asarco, 430 F.3d at 979. The Army does not establish this. It makes no showing that the delay in completing the EIS directly affects its ability to comply with the Stipulated Order. At most, the Army argues that it needs to conduct live fire training now to train soldiers scheduled to leave for Iraq, but, as discussed above, the Army does not meet its burden of showing that such training must occur *at Makua*. The delay in completing the EIS was anticipated and has not made the Army's efforts to comply with the Stipulated Order more onerous or unworkable.

Even if the delay in completing the EIS did make compliance with the Stipulated Order more onerous, modification of the Stipulated Order would not be warranted unless the Army satisfied the "heavy burden" of convincing this court that the Army "agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b).'" Id. at 984 (quoting Rufo, 502 U.S. at 385). In this regard, the court is concerned about whether the Army "made a reasonable effort to comply with" the Stipulated Order.

The Army had three years to complete the EIS from October 4, 2001, the date this court adopted the Stipulated Order. Of course, even before then, the Army knew this court's

concerns, set forth at length in the preliminary injunction order in July 2001.  However, more than four years after the Army agreed to "diligently pursue completion of an EIS," Ex. A ¶ 1, the EIS is not done.

Gary N. Shirakata, who is with the United States Army Corps of Engineers ("ACE") and has been the project engineer for the Makua EIS since February 2003, says that the original completion date for the EIS was February 6, 2004.  Declaration of Gary N. Shirakata (11/18/2005) ("Shirakata Decl.") ¶¶ 1, 3. According to Shirakata, that date was moved several times, including once by "21 weeks to allow the public time to review" a separate EIS for a Styker Brigade project on the Island of Kauai. Id. ¶ 8.  Cindy Barger, also with ACE, was the project manager overseeing the development and publication of the Stryker EIS. She explained that the Stryker EIS and the Makua EIS were scheduled for review by the same people at the same time, and that the Makua EIS was twice delayed to give priority to the Stryker EIS.  Deposition of Cindy Barger (12/22/2005) at 7, 11, 13, 15, 20.  She said that a decision was made "to have the Stryker EIS completed more quickly" than the Makua EIS.  Id. at 26.

According to Shirakata, the Makua EIS was delayed by another 21 weeks after a prescribed burn on July 22, 2003, exceeded the designated burn areas.  Shirakata Decl. ¶ 6.  The

burn developed into a wildfire because of a "combination of human error; inadequate communication capabilities at MMR; problems with command and control/synchronization of fire fighting assets; failure to fully utilize aviation assets to suppress the fire; and an unpredictable and unusual change in wind speed and direction." Id.; Ex. 15 at 3.

Given the Army's decision to delay the Makua EIS so that it could complete the Stryker EIS sooner, as well as the Army's mistakes in controlling the prescribed burn, the court is unpersuaded that the Army used "reasonable efforts" to comply with the requirement in the Stipulated Order that the EIS be completed in three years to avoid a ban on live fire training. The Army's errors in connection with the prescribed burn are particularly troublesome given the history of fires that was fully discussed in the preliminary injunction proceedings. The EIS should have been completed by now. The Army fails to satisfy its heavy burden of showing that it "made a reasonable effort to comply with the decree and should be relieved of the undertaking under Rule 60(b)." See Asarco, 430 F.3d at 979. The delay in completing the EIS does not justify modifying the ban on live fire training.

Quite apart from the analysis outlined in Asarco, the Army's reliance on the delay in completion of the EIS is misplaced as a matter of contract law. As the court said in

23

Windward Partners v. Lopes, 3 Haw. App. 30, 33, 640 P.2d 872, 874 (Ct. App. 1982), "It is basic contract law that one party cannot insist upon the performance of a contract or a provision thereof where he, himself, is guilty of a material or substantial breach of that contract or provision."  Having failed to use reasonable efforts to complete the EIS, the Army may not rely on that very failure to escape the consequences of that failure.

> C.  Even if There Are Changed Circumstances, the Balance of Hardships Tilts in Favor of Denying Modification.

Even if the Army did satisfy its burden of establishing that changed circumstances warranted application of paragraph 4(c), the court would not lift the ban on live fire training at Makua.  If the Army satisfied that burden, the court would apply the standard in paragraph 4(c) to determine whether the ban should be lifted.  Paragraph 4(c) states that a motion to modify the limitations on training is "subject to the standards for injunctive relief in cases where a NEPA violation has been found."  Under that standard, the ban on live fire training at Makua should remain in place.

"Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation."  Forest Conservation Council v. United States Forest Serv., 66 F.3d 1489, 1497 (9th Cir. 1995) (citing Thomas v. Peterson, 753 F.2d 754,

764 (9th Cir. 1985)).  In determining whether injunctive relief
is appropriate, "a court must balance the competing claims of
injury and must consider the effect on each party of the granting
or withholding of the requested relief."  Amoco Prod. Co. v.
Village of Gambell, Ala., 480 U.S. 531, 542 (1987).  "[C]ourts of
equity should pay particular regard for the public consequences
in employing the extraordinary remedy of injunction."  Weinberger
v. Romero-Barcelo, 456 U.S. 305, 312 (1982) (citing R.R. Comm'n
v. Pullman Co., 312 U.S. 496, 500 (1941)).

        In the environmental context, the Ninth Circuit
recognizes that, "When the 'proposed project may significantly
degrade some human environmental factor,' injunctive relief is
appropriate.'"  Nat'l Parks & Conservation Ass'n v. Babbitt, 241
F.3d 722, 737 (9th Cir. 2001) (citations omitted).  An
environmental injury "can seldom be adequately remedied by money
damages and is often permanent or at least of long duration,
i.e., irreparable."  Amoco Prod. Co., 480 U.S. at 545.  "If such
injury is sufficiently likely, therefore, the balance of harms
will usually favor the issuance of an injunction to protect the
environment."  Id.

        To obtain an injunction in a NEPA case, a party need
not prove that irreparable harm will in fact occur; potential
irreparable harm will suffice.  "Where an EIS is required,
allowing a potentially environmentally damaging project to

25

proceed prior to its preparation runs contrary to the very purpose of the statutory requirement." <u>Nat'l Parks & Conservation Ass'n</u>, 241 F.3d at 737.

Of course, just because a party violates NEPA does not guarantee an injunction in favor of the other party. <u>See</u> <u>Forest Conservation Council</u>, 66 F.3d at 1496. Rather, the party opposing the injunction "should be allowed to present evidence to the court that 'unusual circumstances' weigh against the injunction sought, and to present evidence to assist the court in fashioning the appropriate scope of whatever injunctive relief is granted." <u>Id.</u> (citation omitted).

In the first three subsections that follow, this court examines each of the competing harms separately. In the fourth subsection, the court balances the harms.

> 1.   Harm to the 25th Infantry Division and <u>National Security.</u>

The Army argues that the irreparable harm to the 25th Infantry Division and the public if the ban on live fire training at Makua continues far outweighs any harm to the environment:

> If the settlement agreement is not modified
> to permit live-fire training, soldiers will
> be sent to war zones without the requisite
> training to fight and win in combat
> operations. Casualties are likely to result
> from the lack of requisite training.
> Training cannot be conducted elsewhere
> because there is not enough time to
> accomplish all of this training at other
> locations with adequate ranges.

> Additionally, to do so would extend
> separations from families jeopardizing morale
> and family cohesion.  Finally, it is in the
> public's interest to provide its soldiers the
> training necessary to survive, fight and win
> in the inevitable combat these soldiers will
> encounter.

Motion at 18-19.  The Army says that any "harm to the plaintiffs and plaintiffs' interests will be minimal due to the mitigation efforts by the Army." Id. at 18.

This court recognizes that there is no heavier weight to balance than the loss of human life.  As this court recognized in the opening paragraphs of this order, if soldiers' training is inadequate, casualties, both military and civilian, will inevitably rise.  However, to outweigh irreparable harm to the environment, the Army must do more than simply declare that training will be inadequate if it does not occur at Makua.  No one is contesting the need for adequate training.  What is at issue is whether the Army meets its burden of making a sufficient showing that Makua has to be used for live fire exercises to ensure that training is adequate.

The Army asserts that "the 25th [Infantry Division (Light)] needs to engage in 30 combined live-fire and maneuver training exercises at MMR from January 2006 until August 2006." Motion at 27.  "[T]he 30 CALFEX's sought include 11 Convoy Live Fires for the deploying elements of the 45th Sustainment Brigade, 10 Convoy CALFEX's for the Combat Aviation Brigade, and 3 Convoy

CALFEXs for [the] Special Troop Battalion." Ex. 4 at 11. The Army says that the remaining six "Convoy CALFEXs would be used by 3rd Brigade units who are unable to complete them at the National Training Center." Ex. 4 at 11. However, to be adequately trained, a unit need not conduct a specific number of convoy company live fire exercises prior to deployment; the unit needs to conduct such an exercise only once, provided it does so correctly. Bednarek Depo. at 151-52. Thus, until the 3d Brigade completes its training at NTC, which "is the most realistic environment that [the Army] can put deploying formations through," Bednarek Depo. at 97, the Army can only speculate that the 3d Brigade will need to conduct further convoy company live fire exercises at Makua. Similarly, the deploying elements of the Aviation and Sustainment Brigades are scheduled to conduct convoy company live fire exercises at NTC. Bednarek Depo. at 53-55 (Combat Aviation Brigade and Sustainment Brigade), 127 (Sustainment brigade), 130, 135. Thus, the need for these units to train at Makua is speculative until each unit completes its training at NTC. The Army does not show that, if the units successfully complete the convoy company live fire exercises at NTC, there will be any need for them to conduct live fire exercises at Makua.

Although the Special Troop Battalion is not currently scheduled to train at NTC, the Army may conduct the necessary

company live fire exercises at PTA.  According to Lieutenant
Colonel Walter E. Piatt, company live fire exercises at PTA would
satisfy the Army's "training standard."  Piatt Depo. at 26-27.
The Army plans to schedule "as many [company live fire exercises]
as we can" at PTA.  Bednarek Depo. at 88.  The court is at a loss
to understand how the Army can determine how many company live
fire exercises it needs to conduct at Makua when the Army is
uncertain how many exercises it will conduct at PTA.

Given the Army's plans to conduct company live fire
exercises for the 25th Infantry Division at NTC and PTA, the Army
can, at this point, only speculate that further live fire
training will be required at Makua after that.  While
transporting troops to those locations will be inconvenient and
time-consuming, "a party may obtain relief from a court order
when 'it is no longer equitable that the judgment should have
prospective application,' not when it is no longer convenient to
live with the terms of a consent decree."  See Rufo, 502 U.S.
at 383.

2.   Harm to Biological and Cultural Resources
     and Native Hawaiian Rights.

Malama Makua contends that the Army has not completely
eliminated threats to biological and cultural resources in Makua.
Motion at 31.  Malama Makua argues that the endangered plants and
animals living at Makua may be irreparably harmed by live fire

29

training.  Opp. at 21.  Malama Makua also maintains that such training threatens to contaminate and damage the archaeological and cultural sites in and around Makua, including Hawaiian temples, petroglyphs, and agricultural features.  Opp. at 28, 36-37.  In response, the Army says that "[t]he harm to plaintiffs in modifying the settlement agreement to resume training at MMR is remote due to the proven effectiveness of the precautions and protective practices put in place by the Army."  Motion at 20.

This court previously noted that "[w]ildfire from training activities is the single largest potential impact on the Makua Valley ecosystem." Malama Makua, 163 F. Supp. 2d at 1208. Although the Army contends that it has successfully protected biological resources from wildfires since entering into the Stipulated Order, the July 2003 prescribed burn, which escaped the firebreak road, affected approximately 2,101 acres, including 150 acres of native habitat.  Ex. 21 at 73.  The fire also caused the loss 150 acres of critical habitat for the endangered elepaio and 6 acres of critical habitat designated for endangered plants. Ex. 21 at 73.  Because the fire escaped the prescribed area due to "a lack of reasonable vigilance by the hold crews," the court questions the Army's ability to protect Makua from future wildfires.

The Army's own Draft Environmental Impact Statement ("DEIS") verifies that "[t]he likelihood of a training-related

fire is moderate to high during live-fire activities," given "the ever-present potential that a single wildfire could escape control and destroy sensitive species or habitat." Ex. 19 at 4-115. The DEIS also states that "[w]ildfire poses a major threat to the Hawaiian ecosystem because native plants and animals are not well adapted to fire." Id.

The DEIS lists more than a hundred archaeological and cultural sites that have been identified at Makua, and more cultural sites continue to be found. Ex. 19 at 3-205 to 3-212; Deposition of Laurie Lucking (12/22/2005) at 40-43. These sites "have the potential to provide important information regarding the demographic changes and settlement shift in the early post-Contact period for leeward Oahu." Ex. 27 at i. "The very survival of native Hawaiian culture depends upon access to these cultural resources." Ex. 29 at 2.

This court previously noted that the use of explosive ordnance has damaged archaeological sites and features within the training area at Makua. Malama Makua, 163 F. Supp. 2d at 1212. Because "[t]he majority of cultural sites discovered in Makua Valley are located within the firebreak road" where live fire training is proposed, the court expressed concern that ordnance and fires would threaten these sites if training is permitted. See id. As Malama Makua points out, even wildfire suppression

techniques can damage fragile cultural and archaeological sites.
See Ex. 23 at MMR-2.

Malama Makua notes that, "[s]ince each of the thirty
CALFEXs defendants seek would last five days, defendants' request
envisions devoting the next 150 days almost exclusively to live-
fire training at MMR, eliminating opportunities for cultural
access." Opp. at 35. The DEIS echoes this concern: "Training
at MMR would limit and significantly reduce the number of days
when [areas of traditional importance] and archaeological sites
could be accessed. This would be a significant impact because
restricting the days sites can be visited may not accommodate the
Native Hawaiians' need to visit sacred or traditional areas
during specific Native Hawaiian traditional periods." Ex. 19 at
4-145 to 4-146.

3.   The Public's Interest.

The Army says that "it is in the public's interest to
modify the settlement agreement to permit training" at Makua
because "the public has a substantial interest in the national
well-being and the security of the nation." Motion at 29. On
the other hand, Malama Makua believes that prohibiting live fire
training at Makua would protect the public's "significant
interest in the protection of endangered species, cultural
resources, Native Hawaiian rights, and the environment of Makua
Valley." Opp. at 40.

32

This court has previously recognized the public's interest in both "the national well-being and security of the nation" and the "the protection of endangered species, cultural resources, Native Hawaiian rights, and the environment of Makua Valley." Malama Makua, 163 F. Supp. 2d at 1222.

4.   Balancing the Harms.

As the party seeking a modification of the ban on live fire training that it agreed to and that this court ordered, the Army has the burden of showing that the harms it raises outweigh the harms identified by Malama Makua.  The Army does not meet that burden at this time.

If the Army could do more than speculate that American troops would be inadequately trained absent live fire training at Makua, the Army's position would be powerful indeed.  It might then be difficult for Malama Makua to advance interests that outweighed those presented by the Army, as Malama Makua would be arguing that, for example, preservation of archaeological sites trumped preservation of human life that was at imminent risk.  But that is not the dilemma the Army actually presents on this motion.  That is only the dilemma the Army would like this court to assume.

In actuality, the Army presents vehement pronouncements and speculation.  Those do not carry the day.  The Army only

33

speculates that, without live fire training at Makua, the 25th Infantry Division will not be adequately trained.

That is not to say that, on this kind of motion, the Army must conclusively establish that the harms it identifies will indeed occur. Nor is anyone arguing that the harms must have actually occurred. Injunctive relief, after all, is designed to prevent the occurrence of irreparable harm. But something more than speculation is called for. If the Army is correct in its contention, it has yet to make any showing that it is correct. And the Army's position is not strengthened by its own responsibility for creating the very situation it now complains of. That is, it is barred from conducting live fire training exercises at Makua precisely because it was not diligent in completing the EIS within three years.

By contrast, the record establishes that allowing the Army to conduct live fire training at Makua is likely to significantly degrade biological, cultural, and archaeological resources in Makua, as well as rights to access cultural sites. See Nat'l Parks & Conservation Ass'n, 241 F.3d at 737. When Malama Makua's concerns are weighed against the Army's speculation, the balance tips in Malama Makua's favor.

Added to that balance is the public's interest. Because training is available at locations such as NTC and PTA, and because the Army, at this point, only speculates that live

fire training at Makua is necessary, the court concludes that the threat to the public's interest in national well-being and security is outweighed by the likelihood that such training will cause the extinction of endangered species, the loss of cultural resources, the denial of Native Hawaiian rights, and other adverse effects on the environment.

Even assuming paragraph 4(c) applies to the ban on live fire training, and even assuming there are "changed circumstances," the balance of hardships weighs against lifting the ban on live fire training.

IV.      <u>CONCLUSION.</u>

The court denies the Army's motion to lift the ban on live fire training.  Pursuant to the Stipulated Order, "no live fire training shall be conducted at MMR until defendants complete the EIS and publish a ROD."

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 2, 2006.

_____
Susan Oki Mollway
United States District Judge

**<u>Malama Makua v. Donald Rumsfeld et al.</u>, Civ. No. 00-00813 SOM/LEK; ORDER DENYING DEFENDANTS' MOTION TO MODIFY SETTLEMENT AGREEMENT AND STIPULATED ORDER**