IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MĀLAMA MĀKUA, a Hawai`i non-profit corporation, | ) ) ) | CIVIL NO. 00-00813 SOM |
| Plaintiff, | ) ) | AMENDED ORDER ENFORCING 2001 SETTLEMENT AGREEMENT |
| vs. | ) ) | |
| ROBERT GATES, Secretary of Defense; and PETE GEREN, Secretary of the United States Department of the Army, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

AMENDED ORDER ENFORCING 2001 SETTLEMENT AGREEMENT

I.      INTRODUCTION.

        This case arises out of a Complaint filed on December

20, 2000, that was amended on May 20, 2001.  The major issue in

the First Amended Complaint was whether Defendants had to prepare

an environmental impact statement ("EIS") addressing the effects

of military training with live ammunition at the Makua Military

Reservation ("MMR") in West Oahu, Hawaii.

        This court entered a preliminary injunction barring

live-fire training exercises at MMR.  Thereafter, on October 4,

2001, the parties, considering the impact of the attacks of

September 11, 2001, on military training needs, entered into a

Settlement Agreement and Stipulated Order ("Settlement

Agreement").  The case was dismissed with prejudice.  As part of

the extensive Settlement Agreement, the Army agreed to prepare an

EIS and to take certain actions with respect to unexploded ordnance ("UXO") at MMR and Mālama Mākua's access to cultural sites at MMR.

On January 13, 2006, Mālama Mākua filed a motion to enforce the Settlement Agreement. This motion sought to compel the Army to complete a revised draft EIS and archaeological surveys. The motion also sought to have the Army clear UXO and expand public access to cultural sites at MMR. On March 6, 2006, this motion to enforce was withdrawn. However, Mālama Mākua was allowed to reinstate the motion by filing an amended notice of hearing. See Entering Order (March 6, 2006).

More than two years later, on February 20, 2008, Mālama Mākua filed an amended notice of hearing and a "reply" in support of its motion. The reply makes it clear that the only matters for which court intervention is still sought concern the clearing of UXO and Mālama Mākua's access to certain cultural sites. In essence, this "reply" is now the motion before the court.

By failing to timely identify "high priority" cultural sites to be cleared of UXO, the Army failed to comply with paragraph 8(b) of the Settlement Agreement. This also means that the Army failed to use good faith efforts to develop a plan and secure funding for clearing UXO from the "high priority" sites that the Army was supposed to identify, as further required by paragraph 8(b) of the Settlement Agreement.

2

In 2005, the Army, citing safety concerns and regulations, unilaterally cut off nearly all access that members of Mālama Mākua had had to MMR.  This action violated paragraph 13 of the Settlement Agreement, which allowed the Army to set limitations on access to MMR, so long as those limitations were set in consultation with native Hawaiian practitioners.

Having determined that the Army has violated the Settlement Agreement, the court orders compliance with the Settlement Agreement and orders the Army to make quarterly written reports to the court detailing its compliance.  Such quarterly reports must continue until UXO has been cleared from the identified "high priority" cultural sites, or until further ordered by the court.

II.     FACTUAL BACKGROUND.

        A.     The Settlement Agreement.

        In paragraph 8 of the Settlement Agreement, the Army agreed to take certain actions pertaining to UXO:

> Defendants . . . shall address UXO at MMR in the following manner:
>
> a.  In order to reduce the risk to individuals on Mākua Beach and Farrington Highway, the 25th ID (L) [the Army] shall finalize and submit to HQDA [Headquarters, Department of the Army] for approval a plan for UXO clearance for the area within MMR extending 1,000 meters mauka (towards the mountains) from Farrington Highway. . . .
>
> b.  In addition, within one year of the date of settlement, the 25th ID (L) shall

identify additional, high priority areas at MMR for UXO clearance, with the focus on increasing access to cultural sites.  The 25th ID (L) shall provide meaningful opportunities for the people of the Wai`anae Coast to participate in identifying and prioritizing these areas . . . .  After identifying these additional, high priority areas, the 25th ID (L) shall make good faith efforts promptly to develop a plan and secure special funding for the clearance of UXO from these areas to provide safe, controlled access to identified cultural sites.  The clearance plan and activities are subject to any limitations imposed by FWS in ESA section 7 consultation, safety requirements, available funds specifically for UXO clearance, and available and appropriate technologies and methods.

Settlement Agreement ¶ 8(a) and (b).

Paragraph 13 of the Settlement Agreement also provided:

Members of the Wai`anae Coast community, including Mālama Mākua, will be allowed daytime access (sunrise to sunset) to MMR to conduct cultural activities at least twice a month . . . [and] will be allowed overnight access (from two hours before sunset on the first day until two hours after sunset on the second day) to MMR to conduct cultural activities on at least two additional occasions per year. . . .  The cultural access provided for in this paragraph will be subject to limitations determined by defendants in consultation with native Hawaiian cultural practitioners, including those from Mālama Mākua, based on requirements for training, safety, national security, and compliance with applicable laws and regulations.  The Parties will establish protocols for this access promptly, with the first daytime access taking place no later than sixty (60) days following the Court's approval of this Agreement and the first

> overnight access taking place no later than
> the December 14-15, 2001 Makahiki observance
> described above.

Settlement Agreement ¶ 13.

### B.    Public Access to MMR Cultural Sites.

After the parties entered into the Settlement Agreement in 2001, members of Mālama Mākua were allowed to visit cultural sites that they had not previously been allowed to visit: 4536, 4537, 4538, 4539, 4541, 4542, 4543, 4544, 4545, 4546, 4547, 5456, 5924, and 5926.  See Declaration of Frederick A. Dodge (Feb. 15, 2008) ¶ 4; Declaration of Leandra Wai (Feb. 13, 2008) ¶ 3; Declaration of Dr. Laurie Lucking (Feb. 11, 2006) ¶ 16 ("Before the Army entered into the Settlement Agreement, the public had no access to any cultural sites at Makua, other than Ukanipo Heiau.").  The pathways to and areas surrounding these sites "were surface swept in 2001 to make sure they were clear of ordnance."  Lucking Decl. ¶ 23.  For the next three years, until approximately October 2004, members of Mālama Mākua and the public were allowed to visit these sites.  Lucking Decl. ¶ 24.

In September 2004, the Department of Defense Explosives Board ("DDESB") conducted an inspection that "restricted access to certain cultural sites by non-government personnel due to safety concerns relating to the presence of UXO at Makua, as well as Department of Defense and Department of the Army regulations

prohibiting public access to impact areas containing UXO."
Lucking Decl. ¶ 25.

In January and February 2005, the United States Army
Technical Center for Explosives Safety ("USATCES") conducted a
risk assessment.  Lucking Decl. ¶ 26; Declaration of Sammy C.
Houseberg (Feb. 1, 2006) ¶ 30.  This risk assessment appears to
have been triggered by the September 2004 DDESB inspection.
USATCES then issued a report stating that, for members of the
public to visit cultural sites at MMR, "there must be clearly
defined and marked trails (footpaths) and cultural sites cleared
subsurface to a depth of one foot."  Houseberg Decl. ¶ 32.  There
is no dispute that the Army, acting unilaterally (that is,
without any consultation with native Hawaiian cultural
practitioners), told members of Mālama Mākua in February 2005
that they could not visit the 12 cultural sites at MMR that they
previously were allowed to visit.  See also Wai. Decl. ¶ 4
(indicating that, because of the USATCES report, members of
Mālama Mākua could no longer visit the 12 cultural sites that
they had previously been visiting).  Mālama Mākua disagreed with
this report, pointing out that its members had been visiting the
12 cultural sites for several years.

In March 2006, Mālama Mākua met with Lucking and the
Army's Garrison Commander to discuss sites 4537, 4542, 4546, and
5456.  See Declaration of Dr. Laurie Lucking (Feb. 26, 2008)

("Lucking Decl. II") ¶ 1.  The meeting participants discussed the Army's limited funding and the need to hire outside contractors because the Army did not have ordnance disposal personnel available.  Id. ¶ 2.  At the hearing before this court, counsel for Mālama Mākua represented that the focus was on these four sites as part of the settlement of Mālama Mākua's dispute with the Army concerning the complete lack of access to any of the 12 sites that members of Mālama Mākua had previously been able to visit.  The Army then began the process of clearing the sites to comply with the USATCES report.

Clearing the cultural sites of UXO, however, did not mean simply detonating or removing the UXO.  The Army had to comply with environmental laws.  In July 2003, the Army attempted a "prescribed burn," a fire deliberately set to clear vegetation.  See Declaration of Sammy C. Houseberg (Feb. 1, 2006) ¶ 20; see also Declaration of Joel Godfrey (Feb. 1, 2006) ¶ 5.  The Army hoped that this fire would uncover UXO and allow archeological surveys to be safely conducted after the UXO was cleared.  See Houseberg Decl. ¶ 21.  Before conducting the "burn," the Army prepared a "burn plan" and consulted with the United States Fish and Wildlife Service ("FWS") about how the fire would affect organisms protected by the Endangered Species Act.  The FSW concurred with the "burn plan."  Godfrey Decl. ¶ 5.  The July 2003 fire, however, burned out of control and covered more than

7

the planned area.  <u>See</u> Houseberg Decl. ¶ 22.  It caused damage to

endangered species and their critical habitats.  Godfrey Decl.

¶ 5.  The FWS subsequently told the Army that it would not agree

to future burns at MMR.  <u>Id.</u> ¶ 6.  This limited the Army's

ability to find UXO and the Army's ability in 2005 to clear the

surface of the 12 sites.

The Army also had to comply with historic preservation

laws.  On October 6, 2006, pursuant to the National Historic

Preservation Act, 16 U.S.C. § 470f, the Army sent a letter to

Peter Young, the Chairman of the Department of Land and Natural

Resources and the Hawaii State Historic Preservation Officer.

<u>See</u> Ex. R.  This letter informed the State Historic Preservation

Division of the Army's intent to clear UXO and of the potential

for historic sites to be damaged or destroyed in the process.

<u>Id.</u>  On October 16, 2006, the Army sent Young another letter,

this time advising him that, while clearing the sites would allow

the public to go to the sites, the public visits might damage the

historic sites.  <u>See</u> Ex. S.  It appears that a copy of this

letter was sent to other Hawaiian groups, including Mālama Mākua

and the Office of Hawaiian Affairs, as well as the Advisory

Council on Historic Preservation.  <u>Id.</u>

Donaldson Enterprises, Inc. ("DEI"), the private

contractor hired by the Army to clear UXO from MMR, began

clearing UXO on November 20, 2006, selectively clearing parts of

sites 4536, 4537, 4538, 4541, 4542, 4543, 4544, 4547, 5456, and 5926.  See Lucking Decl. II ¶ 10.  DEI appears to have had the technology to clear UXO in compliance with the USATCES's report without first having to burn MMR's vegetation to see UXO on the surface.  Live ordnance was found near sites 4546 and 5456.  Id. The Army determined that, for safety reasons, the UXO had to be detonated in place.  Id.  The Army says that finding the UXO "stopped all other clearance activities for approximately three months" because access beyond site 5926, which is located at the front of MMR, had to be restricted.  Lucking Decl. ¶ 14.  Mālama Mākua disputes that all of MMR had to be closed, as the ordnance had been in place for years.

On January 11, 2007, the Army contacted the State Historic Preservation Division to explain what the Army intended to do to destroy the UXO found near sites 4546 and 5456, as well as other UXO.  On March 16, 2007, the State Historic Preservation Division said it agreed with the Army that its intended means of destroying the UXO would not adversely affect those cultural sites.  See Ex. V.

It appears that the UXO located near sites 4546 and 5456 was destroyed on March 26, 2007.  See Ex. U, Draft Final Report Munitions and Explosives of Concern Clearance and Disposal, Figure 2-1.  The Army says that consultation with the State Historic Preservation Division led to a delay in destroying

the UXO, but Mālama Mākua says that the Army was dragging its feet and did not really consider the UXO dangerous.

On March 29, 2007, the State Historic Preservation Division told the Army, as part of its ongoing "consultation," that the public should have "controlled access to sites within MMR, after UXO clearance." See Ex. W.  It also suggested a periodic monitoring program to evaluate the effects that the public would have on the sites.  Id.

On May 10, 2007, the Army noted that it had overlooked clearing the internal service roads leading to sites 4537 and 5456.  The Army modified its contract with DEI to include clearing of these roads.  See Lucking Decl. ¶ 16.  Mālama Mākua says that the delay caused by having to clear the roads is more evidence of the Army's foot-dragging.

About a month later, on June 12, 2007, the Army sent a letter to the State Historic Preservation Division summarizing comments that the Army had received following its October 16, 2006, letter (Ex. S).  These comments apparently concerned public access to sites 4537, 4546, 5456, and 4542.  Some commented that those sites were sacred and could be damaged by the public.  See Ex. X.  The Army nevertheless concluded that access to those sites would "have no adverse effect on the cultural resources located on Army lands."  Id.

On the morning of September 1, 2007, the Army allowed members of Mālama Mākua and the Office of Hawaiian Affairs to visit certain cultural sites at MMR.  That afternoon, the Army allowed site visits by members of the Office of Hawaiian Affairs and interested Hawaiians opposed to increasing site access.  <u>See</u> Lucking Decl. ¶ 19; <u>see also</u> Dodge Decl. ¶ 19-21.  Frederick A. Dodge, a member of Mālama Mākua, says that, although he was allowed to walk around site 4542, he could view site 4546 only from an overlook.  Leandra Wai, another member of Mālama Mākua, contradicts Dodge on this point, saying that, although she was originally told that she could not walk around site 4546, she was eventually allowed to walk around it.  <u>See</u> Wai Decl. ¶¶ 6, 8.

The State Historic Preservation Division was unable to attend the September 1, 2007, site visit, so it visited sites on October 23, 2007.  <u>See</u> Lucking Decl. ¶ 19.  The State Historic Preservation Division then met with interested parties, including the Army and Mālama Mākua.  On December 12, 2007, the State Historic Preservation Division made recommendations concerning sites 4537, 4546, 5456, and 4542, saying, among other things, that access should be allowed to those sites for appropriate cultural purposes.  <u>See</u> Ex. Z.

In November 2007, the internal service roads leading to sites 4537 and 5456 were cleared.  In the process, a "250 lb bomb was discovered on the road near site 4546."  Lucking Decl. ¶ 21.

This bomb was destroyed on December 3, 2007, after the Army conducted an "emergency" consultation with state authorities. Id.

On February 9, 2008, members of Mālama Mākua were allowed to walk around sites 4537 and 4546.  See Wai Decl. ¶ 5. The Army at first said they could not walk freely around the sites, but eventually relented.  Id. ¶ 6.  Members of Mālama Mākua were also allowed to walk around site 5456.  See Dodge Decl. ¶ 22.  It does not appear to date that members of Mālama Mākua have been allowed to freely walk around site 4542.  For example, in September 2007, the Army only allowed Dodge to view site 4542 from an overlook.  See Dodge Decl. ¶ 19.  Accordingly, of the four sites discussed at the March 2006 meeting with the Army's Garrison Commander, members of Mālama Mākua may now visit three of those sites and may only view the fourth site from an overlook.  Members of Mālama Mākua say that viewing a site from an overlook is not actual access.  They say this "museum" access does not allow them to practice their culture and/or religion at the site.

There is no dispute that eight of the sites that members of Mālama Mākua previously visited (from 2001 until those sites were closed to the public) remain closed.

C.   The Army's Failure to Identify "High Priority"
     Cultural Sites for UXO Clearance.

Paragraph 8(b) of the Settlement Agreement required the
Army, no later than October 2002, to identify "high priority"
cultural sites outside of the 1,000-meter area mauka (toward the
mountain) of Farrington Highway for UXO clearance.  Mālama Mākua
asserts that the Army has failed to identify the "high priority"
sites.  See Plaintiff's Response (Feb. 28, 2008) at 1 ("In the
past two years, the Army has done nothing to cure its prior
failure to 'identify additional, high priority areas at MMR for
[unexploded ordnance ("UXO")] clearance' . . . , as paragraph
8(b) requires.").

At the hearing on the present motion, the Army told
this court that its identification of "high priority" sites
consisted of sites listed by William Aila on December 10, 2002,
at a meeting held at the Waianae Park Recreation Complex
Community Room.  At that meeting, Aila stated, on behalf of
Mālama Mākua, Hui Mālama o Mākua, and other concerned citizens,
that the "prioritized list of cultural sites for access" included
sites 4540, 4627, 4628, 4629, 5586-5590, 5920, and 9523.  See
Ex. DD.

The Army's statement at last week's hearing appears to
have been the first statement by the Army that it was adopting
Aila's list as the Army's identification of the "high priority"
sites required by paragraph 8(b) of the Settlement Agreement.  No

document announces this adoption.  In fact, at least through October 2003, the Army had failed to adopt or otherwise identify any "high priority" sites.  <u>See</u> Exhibit 41 (stating on the fourth page of the 2003 report by the Army that the Army was working with the public to identify the "high priority" sites).  In Lucking's second declaration, she says that Mālama Mākua had identified sites 4537, 4542, 4546, and 5456 as being "high priority."  <u>See</u> Declaration of Dr. Laurie Lucking (Feb. 26, 2008) ("Lucking Decl. II") ¶ 1.  Lucking says nothing about the Army's identification of these sites as its "high priority" sites. Clearly, Mālama Mākua identified more than those four sites as being "high priority."  <u>See</u> Ex. 56 (identifying sites 4537, 4542, 4546, 5456, 6506, 6596, 6597, and 6603 as Mālama Mākua's high priority sites, in addition to sites 181 and 5926, which were already open to the public).

Having not previously identified any "high priority" cultural sites for removing UXO, the Army came to last week's hearing before this court without having satisfied paragraph 8(b)'s further requirements of a good faith effort (1) to develop an Army UXO removal plan and (2) to secure funding for such removal.

14

III.      ANALYSIS.

          A.   Procedure for Enforcing Settlement Agreement.

          This motion has involved a very unusual procedure and

highlights the need for clearer focus in future proceedings.

This case began in 2000 and was settled in 2001.  Over the years

since settlement, the parties have returned to court several

times with various disputes, sometimes requiring a court ruling,

sometimes resolving matters by stipulation.  The motion giving

rise to the present order was originally filed on January 13,

2006, but then withdrawn as the parties sought to resolve the

matter.  This court told Mālama Mākua that it could resuscitate

its motion by filing an amended notice of hearing of motion.

That was the procedure Mālama Mākua followed two years later.

The relief now sought does not mirror the relief sought in the

original 2006 motion, which was primarily aimed at compelling the

Army to complete an EIS.  Mālama Mākua is now seeking access to

cultural sites in MMR, as promised in the Settlement Agreement.

          At Mālama Mākua's request, this court heard this motion

on an expedited basis.  Because the circumstances had changed

from the time of the briefing in 2006, the court allowed

supplemental briefing.  Mālama Mākua filed a purported "reply"

memorandum on February 20, 2008.  This "reply" memorandum was, in

essence, a new motion by Mālama Mākua.  The Government responded

with a "surreply," filed on February 26, 2008, to which Mālama

                              15

Mākua responded with a filing on February 28, 2008.  The court then held a lengthy hearing on March 3, 2008.  In retrospect, the court concludes that such an expedited schedule was not necessary.

The court requests that any party seeking future enforcement of the 2001 Settlement Agreement consider filing an entirely new complaint, thereby commencing a new civil action. This court would have independent jurisdiction over such a complaint under 28 U.S.C. §§ 1345-46, in addition, of course, to the jurisdiction conferred by Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994).  This filing of a new "complaint" would help the parties to focus on newly arising issues and prevent confusion, given the voluminous case files and changing focus. This process would also automatically allow the parties to conduct such discovery as a matter of course and would provide for the typical orderly scheduling.  Any motion seeking enforcement of the Settlement Agreement would be set in the normal course unless expedited relief was necessary, in which event a party could file a motion for temporary restraining order or request expedited review.  In any new civil action restricted to seeking enforcement of the Settlement Agreement in Civil No. 00-00813 SOM/LEK, the filing fee for commencing an action would be waived.  The filing party should simply show a copy of this order to the Clerk of Court to obtain the waiver.  Moreover, the

16

filing party should indicate to the Clerk of Court that the new case is related to Civil No. 00-00813 SOM/LEK and ask that the same district judge and the same magistrate judge be assigned. Finally in any new action, the procedural provisions of the Settlement Agreement, including paragraph 15(b), would apply. The filing fee waiver and related case assignment would, of course, not apply to any new action going beyond enforcement of the Settlement Agreement.

It is the court's thought that a new action would have the effect of imposing an orderly procedure on future court activity, rather than the frequently <u>ad hoc</u> nature of post-Settlement Agreement proceedings that the court has seen so far. At the same time, the court is attempting to preserve for the parties all of the protections provided by the Settlement Agreement. The court assures the parties that it will act with no less alacrity in any new civil action than in the present action.

B.   <u>This Court Enforces the Settlement Agreement.</u>

Mālama Mākua has asked this court to exercise its inherent power to enforce the Settlement Agreement. Both parties argue that, in deciding whether to enforce the Settlement Agreement, this court should apply Hawaii contract law. <u>See</u> <u>O'Niel v. Bunge Corp.</u>, 365 F.3d 820, 822 (9th Cir. 2004) ("construction and enforcement of settlement agreements are

governed by principles of local law which apply to interpretation of contracts generally"); <u>See</u> <u>TNT Marketing, Inc. v. Agresti</u>, 796 F.2d 276, 278 (9th Cir. 1986) ("The district court had inherent power to enforce the agreement in settlement of litigation before it"); <u>Boskoff v. Yano</u>, 217 F. Supp. 2d 1077, 1085 (D. Haw. 2001) (applying Hawaii contract law to construe a settlement agreement). However, the court notes that, because the Settlement Agreement is a contract with the federal government, it may be that federal common law governs its interpretation. <u>See</u> <u>Funeral Fin. Sys. v. United States</u>, 234 F.3d 1015, 1018 (7th Cir, 2000) ("Interpreting the meaning of a provision in a federal government contract is a matter of federal common law, and therefore, we must apply federal common law rules of contract interpretation"). As it turns out, under either Hawaii law or federal common law, the result is the same.

This court also has the power to enforce its court order approving the Settlement Agreement through contempt proceedings for violations of its order, although this court normally exercises its inherent power to enforce a settlement agreement. <u>See</u> <u>TNT Marketing</u>, 796 F.2d at 278 ("Although the court normally exercises its enforcement power in response to a motion to enforce the agreement, it may do so in contempt proceedings for violation of a court order approving the settlement and commanding or enjoining particular conduct.").

The Settlement Agreement did not require the Army to clear UXO in any particular area of MMR.  Nor did it guarantee Mālama Mākua access to any particular area of MMR.  Paragraph 8(b) of the Settlement Agreement more modestly required the Army to identify "additional, high priority areas at MMR for UXO clearance, with the focus on increasing access to cultural sites."  After the "high priority areas" were identified, the Army, under paragraph 8(b), had to "make good faith efforts promptly to develop a plan and secure special funding for the clearance of UXO from these areas to provide safe, controlled access to identified cultural sites."  Subject to safety requirements and applicable laws and regulations, paragraph 13 of the Settlement Agreement required the Army to give members of Mālama Mākua access to MMR for cultural activities during daylight hours at least twice a month and overnight access at least twice a year.  This access was subject to limitations by the Army, so long as the Army consulted native Hawaiian practitioners and also established protocols governing access.

>     1.    The Army Violated its Duty to Identify "High
>           Priority" Sites.

Paragraph 8(b) of the Settlement Agreement required the Army, no later than October 2002, to "identify . . . high priority areas at MMR for UXO clearance, with the focus on increasing access to cultural sites."  The Army did not identify any "high priority" site by October 2002.

19

This court fully understands that the Army had to balance available funds, limited resources, other priorities, safety considerations, and obligations under environmental and historic preservation laws, with the public's right to visit cultural sites at MMR. But the Army was bound by its agreement under paragraph 8(b) of the Settlement Agreement to identify "high priority" sites by October 2002. There was no agreement that the Army could satisfy paragraph 8(b) by clearing UXO from only the four sites on which it focused.

At best, the Army told this court last week that it was accepting Aila's December 2002 "high priority" sites--sites 4540, 4627, 4628, 4629, 5586-5590, 5920, and 9523. This court is taken aback by this statement. When the Army filed its surreply on February 26, 2008, it made no mention of having satisfied its obligation under paragraph 8(b) by having adopted Aila's list. The Army has no document demonstrating that these sites were indeed adopted by the Army as "high priority" sites. Nor did the Army treat these as "high priority" sites. To the contrary, the Army focused its efforts to clear UXO on only sites 4537, 4542, 4546, and 5456, none of which is on Aila's list. The Army may have focused its efforts on clearing those four sites in an attempt to settle disputes with Mālama Mākua. But nothing before this court indicates that the Army was relieved of its obligation to identify additional "high priority" sites. Moreover, the

court questions whether Mālama Mākua and the Army could even agree to modify the terms of the Settlement Agreement by relieving the Army of any obligation without court approval, as the Settlement Agreement was adopted by this court as an order.

The Army clearly violated the Settlement Agreement by failing to timely identify "high priority" sites outside of the area 1,000 meters mauka of Farrington Highway for UXO clearance.

2.    The Army Violated the Settlement Agreement by Failing to Use Good Faith Efforts Promptly To Develop a Plan and To Secure Funding for the Clearance of UXO From identified "High Priority" Sites

Paragraph 8(b) of the Settlement Agreement provides that, after identifying additional "high priority sites," the Army had to "make good faith efforts promptly to develop a plan and secure special funding for the clearance of UXO from these areas to provide safe, controlled access to identified cultural sites."  These requirements, however, were subject to safety requirements, available funds for UXO clearance, and available and appropriate technologies and methods.  See Settlement Agreement ¶ 8(b).  Having failed to timely identify "high priority" sites, the Army, as it readily conceded at last week's hearing before this court, did not comply with its obligation to make a good faith effort promptly to develop a plan and to secure funding for clearing UXO from the identified high priority sites.

3.   The Army Violated its Duty Under the
Settlement Agreement to Consult with Native
Hawaiian Practitioners Before Setting
Limitations on Mālama Mākua's Right to Visit
Cultural Sites.

Paragraph 13 of the Settlement Agreement provides for

Mālama Mākua's access to MMR "subject to limitations determined

by defendants in consultation with native Hawaiian cultural

practitioners, including those from Mālama Mākua, based on

requirements for training, safety, national security, and

compliance with applicable laws and regulations."  Paragraph 13

also requires the parties to "establish protocols" for this

access promptly.

Mālama Mākua argues that the Army has breached

paragraph 13.  Mālama Mākua says paragraph 13 is being violated

by the Army's unilateral denial of access to 8 of the 12 sites

that Mālama Mākua members were able to visit from 2001 to 2004.

The Army responds that it has always allowed some level of access

to MMR but that it closed certain sites for safety reasons that

were outlined in a report in early 2005.  Notably, the Army knew

about those dangers at those sites even before 2005, yet allowed

access through 2005.

While this court understands Mālama Mākua's questioning

of the closures, this court is in no position to challenge the

closures themselves.  It is, rather, the unilateral nature of the

closures that troubles the court.

22

UXO indisputably poses a serious danger to the safety of people entering MMR.  In 1991, for example, a range control officer at MMR was injured by UXO in a "surface cleared" area that had recently burned.  See Houseberg Decl. ¶ 9.  Until sites are cleared of UXO, safety concerns exist.  This concern is highlighted by the finding, in November 2007, of a "250 lb bomb [that] was discovered on the road near site 4546."  Although, as Mālama Mākua points out, this bomb did not injure anyone and had been present for possibly 60 years with all manner of vehicles driving over it, its existence highlights the Army's concern that undiscovered UXO could harm those visiting the various cultural sites.  As the Settlement Agreement did not require the Army to provide access to any particular site, the denial of access to the 12 sites did not, by itself, violate paragraph 13 so long as other sites remained open and other provisions were complied with.

On the present motion, what is key is the Settlement Agreement's requirement that, before denying access to the 12 cultural sites or, indeed, any cultural site, the Army consult with native Hawaiian cultural practitioners about such a limitation.  Paragraph 13 of the Settlement Agreement gives the members of Mālama Mākua access to MMR, "subject to limitations determined by defendants in consultation with native Hawaiian cultural practitioners, including those from Mālama Mākua, based

on requirements for training, safety, national security, and
compliance with applicable laws and regulations." Settlement
Agreement ¶ 13 (emphasis added). For purposes of this ruling,
this court need not decide whether the Army has worked
expeditiously to reopen sites closed as a result of the USATCES
report.

While the plain language of paragraph 13 gives the Army
the authority to limit access to MMR, this authority is clearly
subject to the Army's duty to consult with native Hawaiian
cultural practitioners about those limitations. Nothing before
this court indicates that the Army consulted native Hawaiian
cultural practitioners in deciding to impose a complete ban on
access to numerous sites. Receiving Mālama Mākua's complaints
about that ban and responding by telling Mālama Mākua the bases
of the already-imposed ban does not constitute "consultation."

The Army argues that the Settlement Agreement does not
require consultation before the setting of limitations on access
to MMR. In other words, the Army says it may limit first,
consult later. While this might make sense in an emergency
situation, it makes no sense under the circumstances before the
court. The court does not have before it a request by Mālama
Mākua for access in the midst of an out-of-control fire or a
hurricane, or while noxious fumes are pervading cultural sites or
while a hidden sniper is shooting at people at MMR. In an

24

emergency, prior consultation might be impossible precisely because the Army has no advance notice of the circumstances requiring it to limit access.  But impossibility of prior consultation is not shown by anything in the record in this case. To the contrary, the Army knew there was UXO long before it denied access, knew of UXO standards announced in 2004, and had every reason to anticipate the conclusion of the 2005 USATCES risk assessment.  The Army cannot clam an emergency here that made consultation impossible.

The Army's "limit first, consult later" reading of the Settlement Agreement would make a nullity of the consultation requirement.  It is a basic tenet of contract construction that a contract should be interpreted to give meaning to all of its terms.  See Restatement (Second) Contracts, § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect") and cmt b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

Setting limitations on access to MMR and thereafter discussing the limitations with native Hawaiian cultural practitioners about those limitations is not "consulting" native Hawaiian cultural practitioners about those limitations.  The limitations have already been imposed before the discussion has

occurred.  Merriam-Webster's Collegiate Dictionary defines

"consultation" as "the act of consulting or conferring," and it

defines "consult" as "to deliberate together," among other

things.  See Merriam-Webster's Collegiate Dictionary 268 (11th

ed. 2005).  The American Heritage Dictionary of the English

Language similarly defines "consultation" as "[t]he act or

procedure of consulting" and defines "consult" as "[t]o seek

advice or information of" or "[t]o have regard for; consider."

The American Heritage Dictionary of the English Language 286

(1978).  In the absence of an emergency making prior consultation

impossible, the plain language of paragraph 13 required the Army

to confer with native Hawaiian cultural practitioners before

limiting access to cultural sites at MMR.  It is in that way that

the Army could seek advice or information about possible actions.

          The Army also argues that, putting aside paragraph 13's

"consultation" provision, protocols established pursuant to the

Settlement Agreement allowed it to deny access based on safety

concerns and to consult with native Hawaiian practitioners after

that denial.  The protocols, Ex. L. ¶ 5(g), require the Army to

promptly confer with an applicant's point of contact in a good

faith attempt to resolve any concerns of logistical issues that

the Army may have and to find a suitable and mutually acceptable

solution to those concerns whenever the Army denies a request for

access to MMR.  Although the Army says that these protocols allow

it to deny access first and consult later, that argument assumes
that the protocols either supersede or inform the Settlement
Agreement's consultation provisions.  The Settlement Agreement
has separate provisions for consultation and developing
protocols, indicating that the parties never intended to allow
the Army to satisfy its duty to consult with native Hawaiian
cultural practitioners merely by developing protocols at a later
time.

In ruling that the Army must consult with native
Hawaiian cultural practitioners about allowing public access to
various cultural sites at MMR, this court is not ruling that the
Army must always follow the wishes of those practitioners.
Paragraph 13 of the Settlement Agreement only requires the Army
to consult with practitioners in light of "requirements for
training, safety, national security, and compliance with
applicable laws and regulations."  While the Army is the final
decisionmaker as to limitations on public access to cultural
sites at MMR, that consultation is imperative.

Finally, Mālama Mākua complains about denials of access
to certain sites in February 2008.  This court need not determine
whether any particular denial of access to a site at MMR violated
the Settlement Agreement.  Mālama Mākua's moving papers sought
only to have this court declare that the "Army has violated its
obligations under paragraphs 8(b) and 13 and to exercise

oversight via quarterly reports to ensure the Army makes expeditious progress in reopening and expanding cultural access at MMR." Reply at 17. The court is able to make its findings without addressing alleged recent denials of access.

> 4. The Army is Ordered To Comply With Paragraphs 8(b) and 13 of the Settlement Agreement and To Submit Quarterly Progress Reports to This Court.

Because the Army has violated paragraphs 8(b) and 13 of the Settlement Agreement, this court agrees with Mālama Mākua that some court oversight is necessary to ensure compliance with those provisions. The court grants Mālama Mākua's request for quarterly reports by the Army on its compliance with paragraphs 8(b) and 13 of the Settlement agreement. The court rejects the Army's argument that judicial intervention is premature because the parties are obligated in any event to consult under the National Historic Preservation Act. This court's imposition of quarterly reports in no way interferes with such consultation and is designed to cure the Army's past violations of paragraphs 8(b) and 13 of the Settlement Agreement.

The first quarterly report shall be filed with this court and served on counsel for Mālama Mākua no later than April 22, 2008. In this report, the Army shall identify all of the sites within 1,000 meters mauka of Farrington Highway. These sites are referred to in paragraph 8(a) of the Settlement Agreement. While Mālama Mākua is not asserting a violation of

28

paragraph 8(a), clarification of the sites identified under paragraph 8(a) will avoid confusion over whether a site is an "additional" site being identified under paragraph 8(b).  In its first report, the Army shall formally identify all "additional, high priority areas at MMR for UXO clearance," as required by paragraph 8(b) of the Settlement Agreement.  The Army is free to expand on Aila's December 2002 list (sites 4540, 4627, 4628, 4629, 5586-5590, 5920, and 9523), but it may not delete any site from that list unless that site has already been cleared of UXO.

The second quarterly report shall be filed with this court and served on counsel for Mālama Mākua no later than July 15, 2008.  In its second report, the Army must provide a "good faith" plan to clear UXO from each of the sites it identified as an additional "high priority" site in its first quarterly report. Implementation of the plan is not required by July 15, 2005, but the Army must comply with its agreement to make a good faith effort to develop such a plan and describe how it intends to secure funding to implement the plan.  This plan shall set forth a proposed schedule for clearing UXO from each identified additional "high priority" site, taking into account availability of funding, as well as compliance with various laws and regulations, especially the historic preservation laws that the Army claims have contributed to previous delays in clearing MMR cultural sites of UXO.  If there is no reasonable and practicable

29

way to clear a "high priority" site of UXO, the Army may state so, but should describe its plans to clear the site if it subsequently becomes reasonable and practicable to do so.  For example, if the Army needs to conduct a "prescribed burn" to clear ordnance but cannot do so at this time, the Army should describe its contingent plan to clear the site should there be an accidental fire that allows the Army to clear UXO.

Subsequent quarterly reports shall be due on the fifteenth of October, January, April, and July of each year, or, if the fifteenth is not a business day, on the first business day after the fifteenth.  In each quarterly report, the Army shall describe its further good faith efforts to refine its plan to clear UXO from each of the additional "high priority" sites identified in the first quarterly report.  For each identified "high priority site," subsequent quarterly reports shall also describe the Army's attempts to secure funding to implement its plan, as well as the Army's actual efforts to implement its plan to the extent possible.  The quarterly reports shall discuss any change in the timetable or method for clearing a site, explaining why the change is or was necessary.

The quarterly reporting requirements shall remain in effect until all sites identified as "high priority" have been cleared of UXO, or until the court orders otherwise.

IV.        <u>CONCLUSION.</u>

The Army has violated paragraphs 8(b) and 13 of the Settlement Agreement.  The court orders the Army to submit the quarterly reports described herein until UXO has been cleared from the MMR sites identified by the Army as "high priority" or until further ordered by this court.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 9, 2008.



 /s/ Susan Oki Mollway 
Susan Oki Mollway
United States District Judge


<u>Mālama Mākua v. Gates</u>, Civ. No. 00-00813 SOM-LEK; Amended Order Enforcing 2001 Settlement Agreement

31